1

2

3

4

5

6

7

8

9                          UNITED STATES DISTRICT COURT

10                      FOR THE EASTERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12   JARED M. VILLERY, | Case No.  1:15-cv-01360-DAD-HBK (PC) |
| 13           Plaintiff, | ORDER GRANTING DEFENDANT NELSON'S REQUEST FOR JUDICIAL NOTICE |
| 14       v. | (Doc. No. 85-5) |
| 15   JAY JONES, RICHARD SCHMIDT, CHRISTOPHER YERTON, RAFAEL ESCARCEGA, and DAVID NELSON, | FINDINGS AND RECOMMENDATIONS TO GRANT DEFENDANT NELSON'S MOTION FOR SUMMARY JUDGMENT[1] |
| 16 | |
| 17           Defendants. | (Doc. No. 85) |
| 18 | FOURTEEN-DAY OBJECTION PERIOD |
| 19 | |
| 20 | |

21          Pending before the Court is Defendant Nelson's motion for summary judgment filed on

22   June 22, 2020.[2]  (Doc. No. 85, "MSJ").  Defendant Nelson requests the Court to take judicial

23   notice of the California Code Regs. Tit. 15 section 3269 which were in effect at the time of the

24   incident and is pertinent to Plaintiff's claim against Nelson.  (Doc. No. 85-5).  Plaintiff received a

25   ─────────────────────

26   [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2022).

27   [2] A separate motion for summary judgment is pending the Court's review filed on behalf of Defendants

28   Schmidt, Jones, and Escarcega. (Doc. No. 129, MSJ).  The Court will address these Defendants' MSJ by a separate findings and recommendations.

*Rand*[3] warning and multiple extensions of time, but did not file a response in opposition to Defendant Nelson's MSJ.  (*See* docket).

The undersigned grants Defendant Nelson's request for judicial notice.  Finding no genuine dispute as to any material facts, the undersigned recommends the district court grant Nelson's MSJ on Plaintiff's First Amendment retaliation claim.

## I. PROCEDURAL HISTORY AND SUMMARY OF OPERATIVE PLEADING

Plaintiff Jared M. Villery, a state prisoner, initiated this action by filing a pro se civil rights complaint under 42 U.S.C. § 1983.  (Doc. No. 1).  Plaintiff is proceedings on his on his First Amended Complaint filed on May 26, 2017.  (Doc. No. 16, "FAC").  On November 13, 2017, the previously assigned magistrate judge issued findings and recommendations on the FAC finding it stated various cognizable First Amendment retaliation claims against Defendants Jones, Schmidt, Yerton, Escarcega, and Nelson, but no other claims. (*See generally* Doc. No. 19 at 1-18).  In short, the findings and recommendations found cognizable First Amendment retaliation claims stemming from the following incidents, involving the following Defendants, including Nelson:

> (1) against Jones and Schmidt stemming from the January 21 and January 22, 2014 attempt to move Plaintiff to administrative segregation and threat to bring disciplinary proceedings; [4]
>
> (2) against Jones and Schmidt stemming from the January 27, 2014 false disciplinary report;
>
> (3) against Jones for denial of access to the law library;
>
> (4) against Schmidt stemming from a June 29, 2017 threat to file a false disciplinary charge if Plaintiff filed another complaint against Schmidt;
>
> (5) against Schmidt, Yerton, and Escarcega stemming from a threat to change Plaintiff's housing assignment to a double cell with inmate Cedric Jones and then ultimately facilitating a housing transfer for

---

[3] *Rand v. Rowland*, 154 F.3d 952, 962-63 (9th Cir. 1988)(en banc)

[4] The findings and recommendations noted: "[b]oth the attempted move to Administrative Segregation and the threat of disciplinary charges are threats which would chill First Amendment activity. . .  Furthermore, the pleadings suggest no legitimate penological purpose for Defendants' [Schmidt and Jones] conduct. While it is not entirely clear that Plaintiff's discussion with mental health care providers is protected conduct, this uncertainty likewise means that the Court cannot conclude that the allegations fail to state a claim on that basis." (Doc. No. 19 at 12)(citations omitted).

Plaintiff to be housed with Jones;

 **(6) against Nelson related to the same housing transfer with inmate Cedric Jones to the extent Nelson escorted him; and**

(7) against Jones regarding his March 20, 2014 refusal to forward Plaintiff's inmate grievance because he thought Plaintiff was a liar.

(*Id*. at 9-18) (emphasis added).  The district court adopted the findings and recommendations in full on January 23, 2018.  (Doc. No. 23).  Plaintiff proceeds on his FAC on the above claims deemed cognizable at screening.

Pertinent for consideration of Defendant Nelson's MSJ is Plaintiff's sole claim against Nelson—a First Amendment retaliation claim for Nelson's involvement in housing Plaintiff with inmate Cedric Jones.  The factual allegations in support of Plaintiff's First Amendment retaliation claim against Defendant Nelson are set forth *infra*.  As relief, Plaintiff seeks compensatory damages of $41,050, punitive damages of $180,000, costs of suit, and any other relief the Court deems appropriate.  (Doc. No. 16 at 21).

## II.  APPLICABLE LAW

### A.  Summary Judgment Standard

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material where it is (1) relevant to an element of a claim or a defense under the substantive law and (2) would affect the outcome of the suit.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1987).

The party moving for summary judgment bears the initial burden of proving the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the moving party has met this burden, the nonmoving party must go beyond the pleadings and set forth specific facts, by affidavits, deposition testimony, documents, or discovery responses, showing there is a genuine issue that must be resolved by trial.  *See* Fed. R. Civ. P. 56(c)(1); *Pacific Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021).  A mere "scintilla of evidence" in support of the nonmoving party's position is insufficient.  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  Rather, the

1  evidence must allow a reasonable juror, drawing all inferences in favor of the nonmoving party,

2  to return a verdict in that party's favor.  *Id.*

3        A court must view the evidence in the light most favorable to the nonmoving party.

4  *Tolan v. Cotton*, 572 U.S. 650, 655 (2014).  It may not weigh evidence or make credibility

5  determinations.  *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017).  Conclusory or

6  speculative testimony in affidavits and supporting papers is insufficient to raise a genuine issue

7  of fact and defeat summary judgment.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984

8  (9th Cir. 2007); *see* Fed. R. Civ. P. 56(c)(2).  Furthermore, the Ninth Circuit has "held

9  consistently that courts should construe liberally motion papers and pleadings filed by *pro se*

10  inmates and should avoid applying summary judgment rules strictly."  *Soto v. Sweetman*, 882

11  F.3d 865, 872 (9th Cir. 2018) (quoting *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir.

12  2010)).

13        **B.  First Amendment Retaliation**

14        To prevail on a retaliation claim under the First Amendment, a plaintiff must show five

15  requisite elements: (1) he was engaged in a protected conduct; (2) the defendant took adverse

16  action against the plaintiff; (3) a causal connection between the adverse action and the protected

17  conduct; (4) the official's acts would chill a person of ordinary firmness from future exercise of

18  First Amendment rights; and (5) the action taken by the officials did not reasonably advance a

19  legitimate correctional goal.  *See Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012); *see also*

20  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

21        Filing an inmate grievance is protected conduct.  *Rhodes*, 480 F.3d at 568.

22  Correspondingly, threatening to file an inmate grievance has been deemed protected conduct by

23  the court.  *See Gleason v. Placencia*, Case No. 1:19-cv-539-LJO-EPG, 2020 WL 3497001, at *3

24  (June 29, 2020 E.D. Cal. 2020)(citations omitted)(recognizing courts have considered a request to

25  obtain a grievance form or merely threatening to file a grievance within the purview of actions

26  protected by the First Amendment).  Regarding the second element, the adverse action taken

27  against the prisoner "need not be an independent constitutional violation.  The mere threat of

28  harm can be an adverse action."  *Watison*, 668 F.3d at 1114 (internal citations omitted).  The

4

causal connection between the adverse action and the protected conduct can be inferred from the chronology of events.  *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).  But, depending on the facts presented, mere timing of events may not be sufficient to establish causation.  (*Id.*).

Evaluation of a retaliation claim by a prisoner must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.' "  *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (quoting *Sandin v. Conner*, 515 U.S. 472, 482 (1995)).  Courts must " 'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory."  *Id.* (quoting *Sandin*, 515 U.S. at 482).

### III. ANALYSIS

The undersigned has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties.  The omission to an argument, document, paper, or objection herein is not to be construed that the undersigned did not consider the argument, document, paper, or objection.  Instead, the undersigned thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate for purposes of issuing these Findings and Recommendations on Defendant Nelson's MSJ.

### A. Allegations of First Amendment Retaliation in Plaintiff's FAC

The incidents giving rise to the claim occurred after Plaintiff was transferred to California Correctional Institution ("CCI") in early 2014 and he "began initiating grievances" against Captain Jay Jones, another named defendant.  (Doc. No. 16 ¶2 ).  Plaintiff suffers from PTSD, which "creates significant problems between him and other inmates who are forced to share living quarters" with him.  (Id. ¶16).  Specifically, Plaintiff claims his PTSD "could lead to violence between him and potential future cellmates."  (Id. ¶17).  Plaintiff met with Defendant Schmidt on January 21, 2014 and Schmidt told Plaintiff there is no single cell housing available, accused Plaintiff of "making threats" and ordered Plaintiff placed in administrative segregation

("Ad-Seg") (*Id*. ¶¶18-19).[5]  Because there was no space in Ad-Seg, Schmidt directed Plaintiff to be returned to his cell until a space opened in Ad-Seg.  (*Id*. ¶20).  Defendant Nelson returned Plaintiff to his cell, advised him that he was "pending Ad-Seg status" and could not leave his cell, and logged this information in the log book.  (*Id*. ¶17).  The remaining facts involving Nelson in the FAC are limited and involve only Nelson's involvement concerning Plaintiff's housing with inmate Cedric Jones ("inmate Cedric") six and seven months later, in June and July of 2014.

Plaintiff and inmate Cedric were first housed together on June 18, 2014.  (*Id*. ¶ 34). Inmate Cedric was moved into Plaintiff's cell.  (*Id*.).  Plaintiff describes inmate Cedric as having "severe mental health problems," demonstrating "erratic behavior" and suffering from "severe paranoia and delusions."  (*Id*.).[6]  Plaintiff alleges inmate Cedric asked the housing unit officers to move him from Plaintiff's cell.  (*Id*. ¶ 35).  Plaintiff alleges he "pleaded with" Defendant Nelson to move inmate Cedric every day "before [he and inmate Cedric] got into a fight" but Nelson refused and told him inmate Cedric would only be moved "after they got into a fight."[7]  (*Id*.). Plaintiff and inmate Cedric remained housed together for eight days and "nearly got into an altercation every day."  (*Id*. ¶ 36).  Plaintiff states he only slept while inmate Cedric was in the yard or dayroom causing him to suffer sleep deprivation.  (*Id*.).  On June 26, 2014, Plaintiff handed a "complaint"[8] to Nelson "to be delivered to Defendant Jones."  (*Id*. ¶ 34).  Initially Nelson refused to send the complaint but then acquiesced.  (*Id*. ¶ 37).  Floor Officer Lindsey moved Plaintiff on June 28, 2014.  (*Id*. ¶¶ 37, 40).  Plaintiff complains that officials should have moved inmate Cedric instead because Plaintiff had a job assignment in Unit Two.  ((*Id*.).

After his move, Defendant Schmidt called Plaintiff to his office and threatened to move Plaintiff back with inmate Cedric.  (*Id*. ¶ 42).  Defendants Escarcega and Yerton summoned

---

[5]  The FAC includes additional claims related to Schmidt's alleged threat to place Plaintiff in Ad-Seg. Because these claims do not involve Defendant Nelson, the undersigned omits the facts as to Plaintiff's other claims against the other Defendants.

[6]  In his deposition, Plaintiff claims inmate Cedric would pace, stand over him mumbling, talk loud to himself and accuse him of "crazy shit."  (Doc. No. 85-4, 16:22-25).

[7]  Defendant Nelson denies ever making this statement or other statements alleged by Plaintiff or ever being hostile to Plaintiff.  (Doc. No. 85-4, 19:12-17; 24:12-13).  The undesigned deems these facts, albeit disputed, not material for purposes of this summary judgment motion.

[8]  The "complaint" was actually a Form 22 requesting a housing move.

Plaintiff to the sergeants' office after Plaintiff's family reached out to an ombudsman.  (Id. ¶ 43).  After a heated exchange of words, Defendants Escarcega and Yerton threatened to move Plaintiff back into a cell with inmate Cedric.  (*Id*. ¶¶ 44, 45).

On July 22, 2014, Plaintiff submitted a complaint to officer Ryan Miller about being moved from Unit Two because it caused him to lose his porter job.  (*Id*. ¶ 46).  On July 24, 2014, Defendant Nelson moved Plaintiff back into a cell with inmate Cedric.  (*Id*. ¶¶ 46, 48).  According to Plaintiff, Defendants Schmidt, Escarcega and Yerton "facilitated the move" of Plaintiff back into a cell with inmate Cedric through Nelson.  (*Id*. ¶ 48).  Plaintiff claims that his placement back with inmate Cedric was not "mere coincidence."  (*Id*. ¶ 47).  Plaintiff points out that inmate Cedric was housed in cell 217, which is an upper tier unit, on the day of the move.  Because Plaintiff had medical restrictions that prevented him from being housed on in an upper tier unit, inmate Cedric had to be first be moved to cell 148, a lower tier unit.  The inmate who had been living alone in unit 148 then had to be moved to cell 217 in the upper tier unit.  Plaintiff then was moved at 7:58 PM back into until 148 with inmate Cedric.  (*Id*. ¶ 47).  Less than an hour after being moved back into the cell with inmate Cedric, Plaintiff submitted a complaint to Nelson.  Nelson told Plaintiff he should not have complained about his job and to file a 602.  (*Id*. ¶ 50).  Plaintiff claims he and inmate Cedric had "confrontations in the cell every day, each time almost resulting in a fight." (*Id*. ¶ 51).  Plaintiff sent letters to the ombudsman and the  warden and was moved three days later.

Plaintiff attributes liability to Defendant Nelson on the basis that Nelson was aware that Plaintiff had previously been moved on June 28, 2014 "because of the danger [Plaintiff] was placed in by living with [inmate] Cedric." (*Id*. ¶ 49; *see also* Claim Six at 19 ¶¶ 87-91).  Plaintiff states that during the time he was housed with inmate Cedric he was "in constant fear' and suffered from 'sleep deprivation."  (*Id*.  ¶90).  As relief, Plaintiff seeks compensatory and punitive damages.  (*Id.* at 21).

**B.  Judicial Notice of CDCR Regulation Governing Inmate Housing Assignments**

Defendant Nelson requests the Court to take judicial notice of the law and regulations that

7

1  govern inmate housing assignments at CDCR institutions that were in effect in 2014, the

2  operative time of the events giving rise to Plaintiff's claim.  (Doc. No. 85-5).  Specifically,

3  Defendant Nelson asks the Court to take judicial notice of the following section from the

4  California Administrative Code:

> Inmates shall accept Inmate Housing Assignments (IHAs) as
> directed by staff.  It is the expectation that all inmates double cell,
> whether being housed in a Reception Center, General Population
> (GP), an Administrative Segregation Unit (ASU), a Security Housing
> Unit (SHU), or specialty housing unit. If staff determines an inmate
> is suitable for double celling, based on the criteria as set forth in this
> section, the inmate shall accept the housing assignment or be subject
> to disciplinary action for refusing.  IHAs shall be made on the basis
> of available documentation and individual case factors.  Inmates are
> not entitled to a single cell assignment, housing location of choice,
> or to a cellmate of their choice.

11  Cal. Code Regs. Tit. 15 § 3269 (2014).

12       Federal Rule of Evidence 201 permits a court to take judicial notice of facts that are "not

13  subject to reasonable dispute" because they are either "generally known within the trial court's

14  territorial jurisdiction," or they "can be accurately and readily determined from sources whose

15  accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The Court may take judicial

16  notice of a pertinent law or regulations at any stage of the proceedings.  *Id.*; *see also National*

17  *Agricultural Chemicals Assn. v. Rominger*, 500 F.Supp. 465, 472 (E.D. Cal. 1980).  The Court

18  may take judicial notice on its own or at the request of any party.  Fed. R. Evid. 201(c).

19       Because the Court may take judicial notice of laws and regulations in effect at the time of

20  the incident, Defendant Nelson's request is granted.  The Court takes judicial notice of Section

21  3269 of the California Administrative Code that governed inmate housing assignments at CDCR

22  institutions in 2014.

23       **C. Undisputed Facts**

24            **1. Plaintiff Filed No Opposition to Nelson's MSJ**

25       Despite reopening discovery and being provided with multiple extensions of time to

26  oppose Nelson's MSJ, which was filed more than two years ago, Plaintiff did not an opposition.

27  (*See* Doc. Nos. 90, 98, 152, 160, 162).  Nor did Plaintiff submit a separate statement of

28  undisputed facts consistent with Local Rule 260(a).  A court may not automatically grant

8

1   summary judgment to a defendant solely because a plaintiff fails to properly oppose the motion.

2   *See* Fed R. Civ. P. 56(e)(2)-(3); *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013).

3   Where a plaintiff fails to properly support an assertion of fact or fails to challenge the facts

4   asserted by the defendant, the plaintiff may be deemed to have admitted the validity of those

5   facts.  *See* Fed. R. Civ. P. 56(e)(2).  A plaintiff's verified complaint may be used to oppose

6   summary judgment, so long as it meets these standards.  *Schroeder v. McDonald*, 55 F.3d 454,

7   460 (9th Cir. 1995); *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).

8   However, a complaint's conclusory allegations, unsupported by specifics facts, will not be

9   sufficient to avoid summary judgment.  *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d

10  912, 922 (9th Cir. 2001).

11       Here, Plaintiff filed a verified FAC.  (Doc. No. 16).  To the extent the FAC contains

12  specific, admissible facts, the Court considers them.  Additionally, the Court will consider the

13  entire record and deem true only those facts which are properly supported by evidence.  A court

14  may grant an inadequately opposed motion for summary judgment if the supporting papers are

15  themselves sufficient to warrant granting the motion and do not on their face reveal a genuine

16  issue of material fact.  *See Henry v. Gill Industries, Inc.,* 983 F.2d 943, 950 (9th Cir. 1993).

17                    **2. Defendant's Evidence**

18       During all times relevant to the FAC, Plaintiff was an inmate in the custody of the

19  California Department of Corrections ("CDCR") and incarcerated at CCI.  (Doc. No. 16 at 2).

20  Plaintiff is serving a 28 year, 4-month sentence.  (Doc. No. 85-4 at 126:22-24).  At the time of the

21  alleged incident, Defendant Nelson was a sworn correctional officer employed by CDCR at CCI,

22  assigned to Housing Unit 2 in Facility C. (Doc. Nos. 16 at 3; 85-4 at 20:6-10).

23       In 2007, Plaintiff was diagnosed with PTSD at Kern Valley State Prison.  Plaintiff

24  attributes his PTSD to "being stabbed by two white inmates… over [his] race" when he was on B

25  yard in Kern Valley State Prison.  (Doc. No. 85-4 at 25:6-13).  Plaintiff preferred to be housed

26  with black inmates.  (Doc. No. 85-4 at 10:12-13).  From 2008 to 2016, Plaintiff was not classified

27  for single cell status.  (Doc. No. 85-4 at 31:16-18).

28       *////*

9

### a. June 2014 Housing

Sometime before June 2014, Plaintiff asked Nelson if he and inmate Hardin could house together, as the two inmates had conversed about being cellmates for months.  (Doc. No. 85-4 at 100:13-24; 106:1-9).  On June 18, 2014, correctional officials housed Plaintiff in Charlie Yard Unit 2 and assigned him a new cellmate named Cedric Jones.  Nelson did he make this housing decision nor participate in moving inmate Cedric into Plaintiff's on this date.  (Doc. No. 85-4 at 21 ¶14).

On June 26, 2014, Plaintiff complained to Defendant Nelson that he was having issues with inmate Cedric.  Plaintiff again requested to be housed with inmate Hardin.  (Doc. No. 85-4 at 21 ¶15).  Defendant Nelson researched both Plaintiff and inmate Cedric's history and found nothing to suggest they were incompatible.  (Doc. No. 85-4 at 21 ¶16).  Nelson also spoke with inmate Cedric regarding Plaintiff's stated concerns, to which inmate Cedric responded that he and Plaintiff were getting along fine.  (*Id*.).  Nelson made unannounced observations of the cell when both inmates were present and saw no tensions or problems. (Doc. No. 85-4 at 21 ¶17).  Rather, on one occasion they were playing dominoes and on another they were laughing and talking. (*Id*).  There were no observed or reported incidents of any altercations between Plaintiff and inmate Cedric during this time period.  (Doc. No. 85-4 at 24 ¶28).

Further, inmate Cedric and Plaintiff had no documented history of in-cell violence at this time.  Plaintiff and inmate Cedric were not documented enemies and both inmates were double cell cleared and race eligible. (Doc. No. 85-4 at 21 ¶16).   Inmate Cedric is white.  (Doc. No. 85-4 at 33).

On June 26, 2014, Defendant Nelson accepted a Form 22 from Plaintiff requesting a cell move, stating he and inmate Cedric were not compatible.  A review of Plaintiff's Form 22 reveals it was not directed against any specific staff-members and requested a cell move because of the "numerous instances of near violence due to [Plaintiff's] own mental issues and mental instability of [his] cellmate."  (Doc. No. 85-4 at 27; *see also* Doc. No. 85-4 at 21 ¶18).  The form is titled "INMATE/PAROLEE REQUEST FOR INTERVIEW, ITEM OR SERVICE."  (Doc. No. 84-4 at 27).  In the form, Plaintiff stated he would be "more compatible" with inmate Hardin.  (Doc. No.

10

85-4 at 21 ¶ 18).  Plaintiff states he has apprised "staff" "on multiple occasion" of his "problems" with inmate Cedric.  (Doc. No. 85-4 at 27).  The only place Defendant Nelson's name appears on the form is in the section showing the form was received by him.  (*Id.*).  Per standard operating procedures, Defendant Nelson placed the Form 22 in the institutional mail.  (85-4 at 21 ¶ 18).  Defendant Nelson did not consider the Form 22 a complaint about him.  (*Id*)

Two days later, on June 28, 2014, correctional officials approved a cell move for Plaintiff to Housing Unit 3, cell 145.  (Doc. No. 85-4 at 27).  Nelson first learned about the move when he returned to work on June 29, 2014.  (Doc. No. 85-4 at 22, ¶ 19).  Nelson was not involved in the move, nor was he told the reason for the move.  (*Id.*).  Due to the housing move, Plaintiff lost his position as a second watch porter and filed a complaint about same.  (Doc. Nos. 16 at 19; 85-4 at 22; 130 at 107:9-15).

### b.  July 2014 Housing

On July 24, 2014, Captain Jay Jones instructed Defendant Nelson to find housing in Unit 2 for Plaintiff, so Plaintiff could resume his second watch porter position.  (Doc. No. 85-4 at 22 ¶20).  Unit 2 was close to full at the time, "making it difficult to unilaterally move an inmate."  Defendant Nelson learned all other inmates in Unit 2 were getting along with their cellmates and examined all available housing option in Unit 2 "with the considerations including the functioning programming going on throughout the unit."  (*Id.*).  A copy of the available bed inventory dated July 30, 2014 for Unit 2 is attached to Nelson's declarations.  (Doc. No. 85-4 at 29-33).  The inventory reveals 6 vacant beds, 5 of which are upper bunks.  (*Id.*).  The sole lower bunk in 114 did not become available on July 29, 2014, which was five days after Plaintiff had been moved.  (*Id*).

Nelson identified two potential cellmates available in Unit 2: inmate Cedric or an inmate who was a "Southern California Skinhead" who had a lower-bunk medical limitation.  Plaintiff also had a lower-bunk medical limitation and thus could only have a cell mate who had no issues with being assigned a top bunk.  (Doc. No. 85-4 at 22 ¶21).  There was no evidence in the record to suggest that there was a conflict or reason why Plaintiff and inmate Cedric could not be housed together.  Inmate Cedric and Plaintiff were not documented enemies. (Doc. No. 85-4 at 22-23

1   ¶21).

2      Defendant reviewed the confidential and miscellaneous files for Plaintiff and inmate

3   Cedric and both inmates' history of aggression.  Nelson found nothing had changed since they

4   were previously housed together.  In reviewing the files, Defendant Nelson saw Plaintiff's June

5   28, 2014 housing change was simply noted as a "cell swap" and there was no notation that

6   Plaintiff could not be rehoused with inmate Cedric.  Nelson personally witnessed on his

7   unannounced visits in June 2014 "both inmates sitting together on the lower bunk, laughing and

8   playing dominoes."  (Doc. No. 85-4 at 22-23 ¶21).

9      Sergeant Ignacia Vera reviewed and approved a Bed Request Batch for inmate Cedric's

10  move into Cell 148.  Meanwhile, another correctional officer issued a Bed Bath Request

11  concerning Unit 3 to move Plaintiff to Unit 2, Cell 148.  Sergeant Davis reviewed and approved

12  that Bed Bath Request.  Central Control then reviewed and processed the Bed Request Batch, and

13  Plaintiff and inmate Cedric were moved that day on July 24, 2014.  (Doc. No. 85-4 at 23 ¶24).

14     On July 24, 2014, Nelson escorted Plaintiff to a cell located in Building 2, where inmate

15  Cedric already was located.  Plaintiff did not refuse to enter the cell with inmate Cedric.  Instead,

16  he went into the cell without saying a word and was not forced in any way.  (Doc. No. 85-4 at 23

17  ¶22).  Had Plaintiff refused to enter the cell, Nelson would not have required him to enter the cell

18  and instead would have placed him in the dayroom and alerted a supervisor.  (*Id*.).

19     Defendant Nelson had no decision-making authority as to Plaintiff's safety Classification

20  or his housing restriction.  (Doc. No. 85-4 at 21-22 ¶18; 23 ¶21).  At his deposition, Plaintiff

21  agreed that his cell move had to be approved by Defendant's superior officer and acknowledged

22  Defendant Nelson did not make the decision on his own "but would have had to come from the

23  top."  (Doc. No. 85-4 at 14:1-9).  Defendant Nelson adhered to CDCR regulations and CDCR's

24  operations manual when evaluating where to rehouse Plaintiff.  (Doc. No. 85-4 at 24-24, ¶30).

25     On July 24, 2014, Plaintiff submitted a Form 22, complaining about being placed back

26  into a cell with inmate Cedric.  This Form 22 was accepted and processed according to CDCR

27  rules and regulations.  (Doc. No. 85-4 at 35).  On August 11, 2014, Plaintiff filed a 602 against

28  Defendant Nelson.  (Doc. No. 85-4 at 15:3-7).  Plaintiff had not previously filed a grievance

1    against Defendant Nelson prior to this date.  (*Id.*).  Defendant Nelson denies moving Plaintiff into

2    a cell with inmate Cedric or making any housing decisions involving Plaintiff for retaliatory

3    reasons.  (Doc. No. 85-4 at 19 ¶5).

4         On July 30, 2014, correctional officials moved Plaintiff from the cell with inmate Cedric.

5    Nonetheless, the two continued to live in the same housing unit without incident.  On November

6    23, 2014, correctional officials moved Plaintiff to a different housing unit.  (Doc. No. 85-4 at 24

7    ¶28).

8              **D.  Defendant Nelson is Entitled to Summary Judgment**

9         First, the undersigned considers whether Plaintiff demonstrates he was engaged in

10   protected conduct.  Admittedly Plaintiff's grievances lodged against other correctional officials

11   are protected conduct, but Plaintiff did not lodge a grievance against Defendant Nelson until

12   August 11, 2014—after he was moved from his second housing placement with inmate Cedric.

13   The Form-22 that Plaintiff delivered to Defendant Nelson on June 29, 2014 was an Inmate

14   Request form.  Defendant Nelson's name appears solely on the form as the person who accepted

15   the form.  The undersigned is constrained to find that Plaintiff's grievances against Defendant

16   Jones qualifies as protected conduct since there is no evidence that Defendant Nelson was aware

17   of those grievances.  Nonetheless, even if the undersigned assumes for purposes of these findings

18   and recommendations that Plaintiff meets the first element of showing protected conduct due to

19   Plaintiff filing grievances against other correctional officials, Plaintiff fails to show that Nelson's

20   limited involvement in Plaintiff's housing assignments with inmate Cedric for the period of June

21   18, 2014 through June 28, 2014 and the period of July 24, 2014 through July 30, 2014 were done

22   for retaliatory purposes.

23            **1.  June 18-24, 2014 Housing Assignment**

24        Plaintiff was first housed with inmate Cedric for six days, from June 18 through 24.  (Doc.

25   No. 16 at 7-8).  It is undisputed that another correctional officer, who is not named as a defendant,

26   moved Jones into Plaintiff's cell on June 18, 2014.  (Doc. No. 85-4 at 106:10-18).

27        In his FAC, Plaintiff claims some six months earlier, in January 2014, he told a mental

28   health counselor that he suffered from PTSD and should not have a cellmate.  (Doc. No. 16 at 4).

1   Defendants Schmidt learned of Plaintiff's statements that he was concerned he would hurt a

2   cellmate due to his PTSD.  Defendants Jones and Schmidt accused Plaintiff of trying to

3   manipulate his housing assignment.  (*Id.* at 4-5).  Plaintiff received a disciplinary report regarding

4   same, was later found not guilty, but had also been placed in administrative segregation.  (*Id.* at 4-

5   6).  It is undisputed that Nelson was not involved in any way with Plaintiff's June 18, 2014

6   housing assignment with inmate Jones.  (*See generally* Doc. Nos. 16 at 4, 7-9; 85-4 at 106:11-18).

7       The only issue Plaintiff attributes to Nelson concerning the June 18 placement was not

8   moving him sooner from the cell after he voiced his complaints to him.  The undisputed evidence

9   demonstrates that Nelson had no authority to change Plaintiff's classification status or effectuate a

10  housing move for any inmate.  The first time Nelson was made aware of any issue between

11  Plaintiff and inmate Jones was on June 26, 2014, when Plaintiff verbally complained to Nelson

12  about inmate Cedric and requested he instead be housed in the same cell with inmate Hardin.

13  (Doc. No. 85-4 at 21 ¶15).  The record reveals, Plaintiff submitted a Form-22 Inmate Request

14  asking for a housing move from inmate Cedric thereafter.  (Doc. No. 85-4 at 27).  Although not

15  clearly legible, it appears Nelson received the grievance on either June 26, 2014 or June 28, 2014.

16  (Doc. No. 85-4 at 27).  Plaintiff states he gave Nelson the Inmate Request form on June 26, 2014.

17  Plaintiff complained he was incompatible with inmate Cedric, citing "near instances" of physical

18  violence due to his own mental instability and his cellmate's mental instability.  (*Id.*).  Plaintiff

19  further wrote that he believed he was housed with inmate Cedric in retaliation since he had

20  submitted a grievance about Captain Jones just seven days before.  (*Id.*).  The grievance itself

21  does not allege any misconduct by Defendant Nelson.  As noted earlier, Defendant Nelson's

22  name only appears on the Inmate Request form because he was the correctional officer who

23  received it and transferred the form to the proper correctional officials for response.

24      On June 29, 2014 correctional officials authored a response to Plaintiff's Request,

25  "partially granting" it to the extent Plaintiff was re-located to a different cell on June 28, 2014.

26  (*Id.*).  According to Nelson's declaration, when he returned to work on June 28, 2014, Plaintiff

27  was no longer housed with inmate Cedric.  (Doc. No. 85-4 at 22 ¶19).

28      The undisputed record evidence reveals no causal connection as to Defendant Nelson's

14

involvement and the placement of inmate Cedric in Plaintiff's cell on June 14, 2014. Irrefutably, an inmate grievance is protected activity under the First Amendment. *Rhodes*, 408 F.3d at 567, Even if the Inmate Request form can be deemed a grievance to warrant protection under the First Amendment, Plaintiff gave the Inmate Request form to Defendant Nelson *after* Plaintiff was already housed with inmate Jones. The timing of the grievance belies any retaliatory intent because Plaintiff was already in the cell with inmate Cedric when Plaintiff submitted the grievance. *See Pratt*, 65 F.3d at 808 (timing can properly be considered as circumstantial evidence of retaliatory intent); *Rivers v. Roszko*, 2008 WL 3932446 *9 (E.D. Cal. Aug. 26, 2008)(noting timing of grievance after the alleged retaliatory transfer belies any retaliatory motive). Although Plaintiff claims Nelson called the Inmate Request form "bullshit" and told him he would not send it to the Captain, the record belies this claim. The record shows Nelson did timely forward the Inmate Request form for review to appropriate officials, as it was thereafter partially granted, resulting in Plaintiff's housing transfer to a different cell away from inmate Cedric two days later.

To the extent Plaintiff faults Nelson for not moving him sooner from the cell, as noted, the record is undisputed that Nelson did not have authority to unilaterally transfer or move inmates. Even if the Court accepts Plaintiff's claim that he and inmate Cedric "nearly" got into an altercation every day, it is undisputed that the inmates never exchanged in any fisticuffs. (Doc. No. 16 at 8). Considering the undisputed facts of record, Nelson is entitled to summary judgment because there is no genuine dispute of material fact concerning Plaintiff's retaliation claim as to Nelson involving the June 18 to June 28 housing assignment with inmate Cedric.

**2. July 24, 2014 Housing Assignment**

Plaintiff admits in his FAC that he requested a housing change back to Unit 2 after he was moved on June 28, 2014 from Unite 2 because he lost his job as a second watch porter. It also undisputed that, on July 24, 2014, Defendant Captain Jones directed Defendant Nelson to find housing for Plaintiff back in Unit 2, so Plaintiff could resume his job as a second watch porter. Thus, the decision to move Plaintiff back to Unit 2 was precipitated not by Nelson, but by Plaintiff's desire to resume his position as a second watch porter.

15

1        The uncontroverted evidence reveals housing in Unit 2 was limited and even more so due

2    to Plaintiff's medical pass requiring that he be placed in a low bunk.  The documents show that on

3    July 24, 2014, only two housing options existed in in Unit 2:  (1) placement back with inmate

4    Cedric; or (2) placement with an inmate who was a "Southern California Skinhead," who had a

5    low bunk pass thereby precluding Plaintiff's placement with him.  Nelson believed the "only

6    feasible" move to get Plaintiff into Unit 2 while accommodating Plaintiff's low bunk restrictions

7    and maintaining functioning programming was to place Plaintiff back with inmate Cedric.

8    Nelson issued the Bed Request Batch for inmate Cedric to be moved into Cell 148, which was

9    approved by Sergeant Ignacio Vera.  A different correctional official then issued a separate Bed

10   Batch Request for Plaintiff to move from Unit 3 to Unit 2, Cell 148, which was reviewed and

11   approved by Sergeant Davis.  Central Control then reviewed and processed both Bed Request

12   Batches and Plaintiff and inmate Cedric were moved to the same cell on July 24, 2022.

13       On the same day of his move—July 24, Plaintiff filed another Form-22 Inmate Request

14   form and delivered it to Defendant Nelson complaining about his rehousing with inmate Cedric

15   and requesting a cell change.  (Doc. No. 85-4 at 35).  Nelson responded in writing that same day

16   that the move was done to accommodate Plaintiff, that inmate Cedric and Plaintiff were "racially

17   compatible," and they were not "confidential enemies."  (*Id.*).

18       Based on this record, Plaintiff has not presented evidence sufficient to overcome Nelson's

19   evidence that the placement of Plaintiff back into a cell with inmate Cedric was not done for

20   legitimate penological reasons.  *Pratt v. Rowland*, 65 F.3d at 807.  To the contrary, Plaintiff

21   acknowledges he did not file a grievance concerning Nelson's actions until August 11, 2014.  By

22   August 11, 2014, Plaintiff was no longer housed with inmate Cedric, but remained on Unit 2 in a

23   different cell.  While Plaintiff maintains his re-housing assignment with inmate Cedric was done

24   for retaliatory purposes, the undisputed record evidence shows there was no protected speech

25   involving Nelson as the impetus behind the alleged retaliatory housing assignment.  Like the June

26   housing assignment, the timing of the grievance belies the retaliatory motive because the

27   grievance came after the housing assignment.  Further, the impetus behind moving Plaintiff back

28   to Unit 2, was to accommodate Plaintiff's requests to continue his job as a porter in Unit 2.  At

1    the time of the events, Plaintiff was cleared for double-celling, preferred a black cellmate and had

2    a lower bunk pass.  Nelson has presented an alternative, legitimate penological reason for

3    Plaintiff's housing assignment: there were no other available double cells in Unit 2 with low bunk

4    accommodations with a race compatible cellmate other than inmate Cedric.  Clearly legitimate

5    penological interests will defeat a retaliation claim.  *See Barnett v. Centoni*, 31 F.3d 813, 815 (9th

6    Cir, 1994); *Bruce v. Ylst*, 351 F.3d 1283-89-90 (9th Cir. 2003).  Nelson presents undisputed

7    evidence that the housing move was motivated by Plaintiff's desire to work as a porter, cell

8    availability and maintaining institutional and programming efficiency.  Further, the Court is to

9    "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered

10   legitimate penological reasons for conduct alleged to be retaliatory."  *Pratt v. Rowland*, 65 F.3d at

11   807 (quoting *Sandin*, 515 U.S. at 482).  Plaintiff does not come forward with evidence to dispute

12   Nelson's evidence that no other housing assignment was available.  And, the timing of the events

13   again belies any retaliatory intent.

14         As Defendant Nelson argues, double celling of Plaintiff with inmate Cedric does not

15   constitute "adverse action" based on the undisputed facts presented.  Pursuant to Cal. Code Regs.

16   Tit. 15, § 3269, inmates are not entitled to single cell housing and in fact the norm is double

17   celling.  Nor are inmates entitled to a cell of their choice or a cellmate of their choice.  The First

18   Amendment inquiry asks, "whether an official's acts would chill or silence a person of ordinary

19   firmness from future First Amendment activities."  Because double celling is the norm, chilling of

20   First Amendment rights based on the double cell assignment present here defies logic.

21   Significantly, the undersigned is not recommending that a plaintiff may never have a retaliation

22   claim based on a housing decision, but the undisputed facts present in this record as it pertains to

23   Nelson are not sufficient.  Mere speculation that Defendant Nelson acted out of retaliation is not

24   sufficient.  *Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014).  Specific evidence of retaliation is

25   required.  *McCollum v. Cal. Dep't of Corr. & Rehab*., 674 F.3d 870, 882 (9th Cir. 2011).  Based

26   on the undisputed material facts, Nelson is entitled to summary judgment because there is no

27   genuine dispute of material fact surrounding Nelson's proffered reasons for moving Plaintiff into

28   a cell with inmate Cedric on July 24, 2014.

1    **E. Qualified Immunity**

2        In the alternative, Defendant Nelson asserts the defense of qualified immunity.  (Doc. No.

3    85-2 at 20-22).  Nelson argues he had no notice based on existing law that housing Plaintiff with

4    inmate Cedric would violate clearly established law.  To the contrary, Nelson maintains his

5    actions complied with the CDCR regulations governing inmate housing assignments.  (*Id.* at 21).

6        Qualified immunity shields government officials from money damages unless their

7    conduct violated "clearly established statutory or constitutional rights." *Kisela v. Hughes*, 138 S.

8    Ct. 1148, 1152 (2018); *accord Felarca v. Birgeneau*, 891 F.3d 809, 815 (9th Cir. 2018).  To

9    overcome the heavy burden of qualified immunity, Plaintiff must show that "(1) the official

10   violated a statutory or constitutional right, and (2) that the right was clearly established at the time

11   of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  Qualified immunity

12   only becomes relevant if a court determines that a constitutional violation has occurred.

13       Because the undersigned has found the record presents no genuine dispute of material fact

14   on Plaintiff's First Amendment retaliation claims as to Defendant Nelson, the undersigned need

15   not evaluate whether Nelson is entitled to qualified immunity.

16       Accordingly, it is **ORDERED**:

17       Defendant Nelson's request for judicial notice (Doc. No. 85-5) is GRANTED.

18       Is if further **RECOMMENDED:**

19       The district court GRANT Defendant Nelson's motion for summary judgment (Doc. No.

20   85) and dismiss Plaintiff's First Amended Complaint against Defendant Nelson with prejudice.

21       ////

22       ////

23       ////

24                          NOTICE TO PARTIES

25       These findings and recommendations will be submitted to the United States district judge

26   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within **fourteen (14)**

27   **days** after being served with these findings and recommendations, a party may file written

28   objections with the court.  The document should be captioned "Objections to Magistrate Judge's

Findings and Recommendations."  Parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

Dated:    October 14, 2022

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE