1

2

3

4

5

6

7

8

9 UNITED STATES DISTRICT COURT

10 FOR THE EASTERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12 JARED M. VILLERY, | Case No.  1:15-cv-01360-ADA-HBK (PC) |
| 13       Plaintiff, | FINDINGS AND RECOMMENDATIONS TO GRANT DEFENDANTS' MOTION FOR |
| 14     v. | SUMMARY JUDGMENT[1] |
| 15 JAY JONES, RICHARD SCHMIDT, CHRISTOPHER YERTON, and RAFAEL | (Doc. No. 129) |
| 16 ESCARCEGA, | FOURTEEN-DAY OBJECTION PERIOD |
| 17       Defendants. | |

18

19       Pending before the Court is the motion for summary judgment filed on behalf of

20 Defendants Yerton, Schmidt, Escarcega, and Jones. (Doc. No. 129, "MSJ").  Plaintiff filed an

21 Opposition, (Doc. No. 164), and Defendants filed a Reply (Doc. No. 171).  After obtaining leave,

22 Plaintiff filed a limited surreply and a response to Defendants' evidentiary objections.  (Doc. No.

23 178).  The undersigned deems the matter submitted on the pleadings and record.  For the reasons

24 set forth below, the undersigned recommends the district court grant Defendants' MSJ.

25       ////

26

27 ─────────────────
[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
28 (E.D. Cal. 2022).

# I.   BACKGROUND

## A.  Procedural History

Plaintiff Jared M. Villery, a former state prisoner currently under pre-release California Department of Corrections and Rehabilitation ("CDCR") community supervision[2], initiated this action by filing a pro se civil rights complaint under 42 U.S.C. § 1983.  (Doc. No. 1).  The previously assigned magistrate judge screened the complaint and found that it stated cognizable First Amendment retaliation claims against Defendants Jay Jones, Richard Schmidt, Christopher Yerton, and Rafael Escarcega, but no other claims.  (*See* Doc. No. 9).  Plaintiff filed an amended complaint, (Doc. No. 16, "FAC") which the magistrate judge screened and found stated cognizable First Amendment retaliation claims as to Jones, Schmidt, Yerton, Escarcega, and Nelson, but no other claims.  (Doc. No. 19).  The district court adopted the magistrate judge's Findings and Recommendation to dismiss certain claims and defendants, and ordered that Plaintiff be permitted to proceed only on his First Amendment retaliation claims against Defendants Jones, Schmidt, Yerton, Escarcega, and Nelson.  (Doc. No. 23).

On October 14, 2022 the undersigned issued findings and recommendations (Doc. No. 184) granting Defendant Nelson's motion for summary judgment as to all claims against him, and the district court adopted the findings and recommendations.  (Doc. No. 185).  Thus, Plaintiff's FAC remains pending before Defendants Yerton, Schmidt, Escarcega, and Jones.

## B.  Summary of Operative Pleading

The incidents giving rise to the FAC took place at California Correctional Institution ("CCI") in Tehachapi, California, where Plaintiff was transferred in January 2014.  (Doc. No. 16 at 2 ¶ 2).  After screening, Plaintiff proceeds on five retaliation claims asserted in the FAC:

> (1) against Jones and Schmidt stemming from the January 21 and January 22, 2014 attempt to move Plaintiff to administrative segregation and threat to bring disciplinary proceedings (Claim 1); [3]

---

[2] *See* https://inmatelocator.cdcr.ca.gov/Details.aspx?ID=V88097 (last visited Sept. 9, 2023).

[3] The screening order findings and recommendations noted: "[b]oth the attempted move to Administrative Segregation and the threat of disciplinary charges are threats which would chill First Amendment activity . . . Furthermore, the pleadings suggest no legitimate penological purpose for Defendants' [Schmidt and Jones] conduct.  While it is not entirely clear that Plaintiff's discussion with mental health care providers is protected conduct, this uncertainty likewise means that the Court cannot conclude that the allegations

1

(2) against Jones and Schmidt stemming from the January 27, 2014
false rule violation report (Claim 2);

2

3

(3) against Jones for denying Plaintiff access to the law library in
February and March 2014 (Claim 3);

4

(4) against Schmidt, Yerton, and Escarcega and Nelson for rehousing
Plaintiff with inmate Cedric Jones (Claim 4);

5

6

(5) against Jones for destroying a March 20, 2014 grievance (Claim
5).

7

(*Id*. at 9-18).

8

As a background matter, Plaintiff claims he suffers from PTSD due to a 2008 attack by

9

other inmates. (*Id*. at 3-4, ¶ 16). Plaintiff states his PTSD "creates significant problems between

10

him and other inmates who are forced to share living quarters" and he has concerns that being

11

forced to live with another inmate "could lead to violence between him and potential future

12

cellmates." (*Id*. ¶¶ 16-17).

13

Claims 1 and 2

14

On January 21, 2014, Plaintiff met with his mental health care caseworker, Ms. Carrizales,

15

with whom Plaintiff "discussed his PTSD symptoms and the problems they had been causing him

16

and his cellmates, as well as [Plaintiff's] concerns that his symptoms could lead to violence

17

between him and potential future cellmates." (*Id*. at 4 ¶ 17). Carrizales reported the conversation

18

to Defendant Schmidt out of concern that Plaintiff might pose a threat to other inmates. (*Id*.

19

¶ 18). Plaintiff then met with Defendant Schmidt regarding his housing assignment, and Schmidt

20

advised Plaintiff that there is no single cell housing available at CCI. (*Id*.). Defendant Schmidt

21

accused Plaintiff of "making threats" in order to secure single cell housing, and ordered Plaintiff

22

placed in administrative segregation ("Ad-Seg"). (*Id*. at 4 ¶¶ 18-19). Due to lack of space in Ad-

23

Seg, Schmidt ordered Plaintiff back to his cell until a space opened in Ad-Seg. (*Id*. ¶ 20). After

24

transporting Plaintiff back to his cell, (former and dismissed) Defendant Nelson advised Plaintiff

25

he was "pending Ad-Seg status" and could not leave his cell. (*Id*.).

26

Jones and Schmidt interviewed Plaintiff for an RVR accusing him of manipulating staff

27

based on his statements to Ms. Carrizales. (*Id*. at 5 ¶¶ 22-23) (stating interview started with "well

28

fail to state a claim on that basis." (Doc. No. 19 at 12) (citations omitted).

it looks like you're going to be on C-status for manipulation of staff."). Plaintiff interpreted Jones' and Schmidt's comments as threatening to discipline him for discussing his PTSD with his clinician. (*Id*. ¶ 23).

On January 22, 2014, Plaintiff submitted "two requests" complaining about conditions at CCI and a grievance against Schmidt and Jones for attempting to place him on Ad-Seg status and threatening him with discipline for seeking mental health treatment. (*Id*. ¶ 24).

On January 27, 2014, Schmidt filed a RVR against Plaintiff for unlawful influence related to Plaintiff's statements to the social worker. (*Id*. ¶ 25). Plaintiff was found not guilty of this RVR after he requested to call the social worker as a witness and "the hearing officer did not want the clinician's statement on the record." (*Id*. at 6 ¶ 26).

Claim 3

Around February 1, 2014, Plaintiff was placed on 90-day restriction from yard activities for an unrelated RVR, which involved Plaintiff's improper possession of a cell phone and charger. (*Id*. ¶ 27). Due to the yard restrictions, Plaintiff's access to the law library was hampered because the yard is the primary way to access the library. (*Id*.). Alternatively, the librarian could call Plaintiff's housing unit for his release to the law library. (*Id*. ¶¶ 27, 29). Plaintiff claims he submitted grievances on January 22, 23, and 30, 2014, two of which were against Jones and Schmidt. (*Id*. ¶ 28). Plaintiff alleges Defendant Jones retaliated against him by impeding his law library access in February and March 2014. (*Id*. at 7 ¶ 33).

Claim 4

On June 18, 2014, Plaintiff was first housed with inmate Cedric Jones ("Cedric"). (*Id*. ¶ 34). Plaintiff describes inmate Cedric as having "severe mental health problems," exhibiting "erratic behavior" and suffering from "severe paranoia and delusions." (*Id*.). Plaintiff claims inmate Cedric asked the housing unit officers to move him from Plaintiff's cell. (*Id*. at 8 ¶ 35). Plaintiff and Cedric remained housed together for eight days and "nearly got into an altercation every day." (*Id*. ¶ 36).

On June 26, 2014, Plaintiff claimed he handed a "complaint" to Nelson "to be delivered to Defendant Jones." (*Id*. ¶ 37). On June 28, 2014, floor officer Lindsey moved Plaintiff out of the

4

double cell with inmate Cedric.  (*Id*. at 8-9 ¶¶ 37, 40).  Plaintiff complains officials instead should have moved inmate Cedric because Plaintiff had a job assignment in Unit Two that he lost due to his cell move.  (*Id*.).

The day after his move, Defendant Schmidt called Plaintiff to his office and accused him of "trying to manipulate staff again."  (*Id*. ¶ 38).  Schmidt told Plaintiff that he does not get to choose who he lives with, and instead correctional officials decide housing for inmates.  (*Id*. at 9 ¶ 39).  Plaintiff complained that his housing move caused him to lose his porter job.  (*Id*. ¶ 40).  In response, Schmidt threatened to move Plaintiff back with inmate Cedric.  (*Id*. ¶ 41).  Defendants Escarcega and Yerton summoned Plaintiff to the sergeants' office after Plaintiff's family reached out to an ombudsman.  (*Id*. at 10 ¶ 43).  After a heated exchange of words, Defendants Escarcega and Yerton also threatened to move Plaintiff back into a cell with inmate Cedric.  (*Id*. ¶¶ 44, 45).

On July 22, 2014, Plaintiff submitted a complaint to officer Ryan Miller about being moved from Unit Two because it caused him to lose his porter job.  (*Id*. at 11 ¶ 46).  On July 24, 2014, Defendant Nelson moved Plaintiff back into a cell with inmate Cedric.  (*Id*. ¶¶ 46, 48).  Plaintiff claims his move back into a cell with inmate Cedric was not "mere coincidence" and claims Schmidt, Escarcega and Yerton "facilitated the move."  (*Id*. ¶¶ 47-48).  Less than an hour after being moved back into the cell with inmate Cedric, Plaintiff submitted a complaint to Nelson.  Plaintiff claims he and inmate Cedric had "confrontations in the cell every day, each time almost resulting in a fight." (*Id*. at 12 ¶ 51).  Plaintiff sent letters to the ombudsman and the warden and was moved three days later.

Claim 5

From January 2014 through October 2014, Plaintiff claims six of his inmate appeals disappeared, including a March 20, 2014 appeal of the RVR for possession of an illegal cellphone.  (*Id*. at 13-14 ¶¶ 55-58, 62).  Plaintiff claims Jones intercepted the appeals out of retaliation.  (*Id*.).

**C. Defendants' Motion for Summary Judgment**

Defendants Yerton, Schmidt, Escarcega and Jones filed the instant Motion for Summary

5

1   Judgment.  In support, Defendants attach the following documents: a statement of undisputed

2   facts (Doc. No. 129-2), the declaration of attorney Arthur B. Marks (Doc. No. 129-3) along with

3   excerpts from Plaintiff Villery's deposition transcript (Doc. No. 129-3 at 5-43), the declaration of

4   A. Carrizales (Doc. No. 129-4),  the declaration of R. Escarcega (Doc. No. 129-5), the declaration

5   of J. Jones (Doc. No. 129-6) attaching copies of rules violation reports ("RVR") issued to

6   Plaintiff (Doc. No. 129-6 at 6-10), a committee report authorizing double celling dated January

7   29, 2014 (Doc. No. 129-6 at 12-13), an RVR dated January 21, 2014 authored by Defendant

8   Schmidt (Doc. No. 129-6 at 17), a grievance titled "Confidential Supplement to Appeal" dated

9   May 12, 2014 (Doc. No. 129-6 at 19), the declaration of J. Stone, Grievance Coordinator at CCI

10  attaching appeal tracking system (Doc. No. 129-7), the declaration of R. Schmidt (Doc. No. 129-

11  8) with attachments (Doc. No. 129-8 at 6-17), and the declaration of C. Yerton (Doc. No. 129-9)

12  with attachments (Doc. No. 129-9 at 5-8).

13      **D.  Plaintiff's Opposition to Defendants' MSJ**

14      After being granted multiple extensions of time, Plaintiff filed an Opposition to

15  Defendants' MSJ.  (Doc. No. 164).  The Opposition incorporates Plaintiff's Response to

16  Defendants' Statement of Undisputed Facts.  (*Id*. at 39-57).  Plaintiff also attaches in a separate

17  filing 40 numbered exhibits in support of his opposition, some of which are duplicative of

18  Defendants' exhibits, which include, *inter alia*, Plaintiff's declaration; a classification chrono

19  dated January 23, 2008; Plaintiff's mental health evaluations dated January 21, 2014; timesheets

20  for Schmidt and Jones; Nelson's supplemental responses to Plaintiff's requests for admission;

21  housing logbooks; a copy of the CDCR mental health delivery system guide; correspondence

22  from attorney Arthur Mark to Plaintiff; CDCR form 22 dated January 23, 2014; and excerpts

23  from CDCR's operation manuals.  (*See generally* Doc. No. 165).

24      **E.  Defendants' Reply**

25      Defendants filed a Reply to Plaintiff's Opposition.  (Doc. No. 171).  Defendants attach to

26  their Reply supplemental declarations from attorney Arthur B. Mark (Doc. No. 171-1), J. Jones

27  (Doc. No. 171-2), and Defendants' objections to Plaintiff's evidence in opposition (Doc. No. 171-

28  3).

6

### F.  Plaintiff's Surreply

After obtaining leave, Plaintiff filed a limited surreply and a response to Defendants' evidentiary objections.  (Doc. No. 178).

## II.  APPLICABLE LAW

### A.  Summary Judgment Standard

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material where it is (1) relevant to an element of a claim or a defense under the substantive law and (2) would affect the outcome of the suit.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1987).

The party moving for summary judgment bears the initial burden of proving the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the moving party has met this burden, the nonmoving party must go beyond the pleadings and set forth specific facts, by affidavits, deposition testimony, documents, or discovery responses, showing there is a genuine issue that must be resolved by trial.  *See* Fed. R. Civ. P. 56(c)(1); *Pacific Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021).  A mere "scintilla of evidence" in support of the nonmoving party's position is insufficient.  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  Rather, the evidence must allow a reasonable juror, drawing all inferences in favor of the nonmoving party, to return a verdict in that party's favor.  *Id.*

A court must view the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 655 (2014).  It may not weigh evidence or make credibility determinations.  *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017).  Conclusory or speculative testimony in affidavits and supporting papers is insufficient to raise a genuine issue of fact and defeat summary judgment.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *see* Fed. R. Civ. P. 56(c)(2).  Furthermore, the Ninth Circuit has "held consistently that courts should construe liberally motion papers and pleadings filed by *pro se* inmates and should avoid applying summary judgment rules strictly."  *Soto v. Sweetman*, 882

F.3d 865, 872 (9th Cir. 2018) (quoting *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)).

### B.  First Amendment Retaliation

The First Amendment prohibits prison officials from retaliating against prisoners for exercising their rights of free speech.  These First Amendment rights include the right to file a grievance or civil rights complaint against correctional officials.  *Brodheim v. Cry*, 584 F. 3d 1262, 1269 (9th Cir. 2009).  And threatening to file an inmate grievance has been deemed protected conduct by the court.  *See Gleason v. Placencia*, 2020 WL 3497001, at *3 (E.D. Cal. June 29, 2020) (citations omitted) (recognizing courts have considered a request to obtain a grievance form or merely threatening to file a grievance within the purview of actions protected by the First Amendment).

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005); *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012).  The adverse action must be of a sufficient nature that it would deter or "chill" a person of "ordinary firmness" in the exercise of his constitutional rights.  *Rhodes v. Robinson*, 408 F.3d 559, 568-69 (9th Cir. 2005). The adverse action taken against the prisoner "need not be an independent constitutional violation.  The mere threat of harm can be an adverse action." *Watison*, 668 F.3d at 1114 (internal citations omitted).  A retaliatory motive may be shown sufficiently convincing circumstantial evidence, as well as direct evidence.  *Bruce v. Ylst,* 351 F.3d 1283, 1288–89 (9th Cir. 2003); *McCollum v. Ca. Dep't of Corr. And Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011).  The causal connection between the adverse action and the protected conduct can also be inferred from the chronology of events. *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).  But, depending on the facts presented, mere timing of events may not be sufficient to establish causation.  *Id.*  And mere speculation that a defendant acted out of retaliation is not sufficient.  *Wood v. Yordy,* 753 F.3d 899, 904 (9th Cir. 2014) (citing

1  cases).

2          In reviewing retaliation claims by a prisoner Courts must be mindful of avoiding

3  "excessive judicial involvement in day-to-day prison management, which 'often squander[s]

4  judicial resources with little offsetting benefit to anyone.'" *Pratt*, 65 F.3d at 807 (quoting *Sandin*

5  *v. Conner*, 515 U.S. 472, 482 (1995)).  Courts must "'afford appropriate deference and flexibility'

6  to prison officials in the evaluation of proffered legitimate penological reasons for conduct

7  alleged to be retaliatory." *Id.* (quoting *Sandin*, 515 U.S. at 482).  Consequently, courts are

8  cautioned to "approach prisoner claims of retaliation with skepticism and particular care" lest

9  "virtually any adverse action taken against a prisoner by a prison official—even those otherwise

10  not rising to the level of a conditional violation—can be characterized as a constitutionally

11  proscribed retaliatory act." *Bacon v. Phelps*, 961 F.3d 533, 543 (2d Cir. 2020) (quoting *Dawes v.*

12  *Walker*, 239 F. 3d 489, 491 (2d Cir. 2001), overruled on other grounds by *Swierkiewicz v. Sorema*

13  *N.A.*, 534 U.S. 506 (2002)).

14                              **III. ANALYSIS**

15          The undersigned has carefully reviewed and considered all arguments, points and

16  authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any,

17  objections, and other papers filed by the parties.  The omission to an argument, document, paper,

18  or objection herein is not to be construed that the undersigned did not consider the argument,

19  document, paper, or objection.  Instead, the undersigned thoroughly reviewed and considered the

20  evidence it deemed admissible, material, and appropriate for purposes of issuing these Findings

21  and Recommendations on Defendants' MSJ.  Further, to the extent that Plaintiff addresses other

22  claims that were not deemed cognizable by the Court's screening order as adopted by the district

23  court, the undersigned declines to address those claims.

24          **A.  Judicial Notice of Inmate Housing Assignments**

25          The Court previously took judicial notice of California Administrative Code provisions

26  concerning housing assignments of inmates in its findings and recommendations on Defendant

27  Nelson's motion for summary judgment.  (Doc. No. 184).  Federal Rule of Evidence 201 permits

28  a court to take judicial notice of facts that are "not subject to reasonable dispute" because they are

                              9

either "generally known within the trial court's territorial jurisdiction," or they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Court may take judicial notice of a pertinent law or regulations at any stage of the proceedings. *Id.*; *see also National Agricultural Chemicals Assn. v. Rominger*, 500 F.Supp. 465, 472 (E.D. Cal. Sept. 19, 1980). The Court may take judicial notice on its own or at the request of any party. Fed. R. Evid. 201(c).

The Court again takes judicial notice of Section 3269 of the California Administrative Code that governs inmate housing assignments at CDCR institutions during the operative time in 2014:

> Inmates shall accept Inmate Housing Assignments (IHAs) as directed by staff. It is the expectation that all inmates double cell, whether being housed in a Reception Center, General Population (GP), an Administrative Segregation Unit (ASU), a Security Housing Unit (SHU), or specialty housing take unit. If staff determines an inmate is suitable for double celling, based on the criteria as set forth in this section, the inmate shall accept the housing assignment or be subject to disciplinary action for refusing. IHAs shall be made on the basis of available documentation and individual case factors. Inmates are not entitled to a single cell assignment, housing location of choice, or to a cellmate of their choice.

Cal. Code Regs. Tit. 15 § 3269 (2014). Recently, the Ninth Circuit reaffirmed that prison officials are entitled to deference for their housing decisions. *Villery v. Beard*, 2022 WL 4462696 *1 (9th Cir. Sept. 26, 2022).

### B. Undisputed Facts

After a thorough review of the record, including, *inter alia*, Plaintiff's verified FAC, Defendant's Statement of Undisputed Facts, Defendants' supporting evidence, Plaintiff's Response to Defendant's Statement of Facts, Plaintiff's opposition and exhibits submitted in support, the undersigned finds the following facts to be undisputed and material, unless indicated otherwise:

- Plaintiff was an inmate in the custody of CDCR and incarcerated at the CCI in Tehachapi, California, from January 14, 2014 to January 9, 2015. (Doc. No. 129-7 at 3 ¶ 7).

- At the time of the incidents, Defendants were sworn correctional officers employed by CDCR at CCI. (Doc. No. 129-5 at 2; Doc. No. 129-6 at 2; Doc. No. 129-8 at 1-2; Doc. No. 129-9 at 1-2).
- From 2008 through 2016, which includes the relevant time period in the FAC, Plaintiff was not granted single-cell status for his PTSD.  (Doc. No. 129-3 at 8:16-18).
- From January 15, 2014 to January 2, 2015, Plaintiff was housed in C-Facility at CCI.  (Doc. No. 129-7 at 3 ¶ 7).
- Defendant Jones was employed by CDCR for 20 years and was a Captain at CCI from 2011 until he retired on December 30, 2015.  From January through July 2014, Defendant Jones was assigned as Captain of C-Facility at CCI (Doc. No. 129-6 at 1-2 ¶ 2).
- Defendant Schmidt was employed by CDCR at CCI for 22 ½ years until he retired in May 2016.  Defendant Schmidt was assigned as a Sergeant to C-yard in January 2014 and promoted to Lieutenant in March 2014.  (Doc. No. 129-8 at 1-2 ¶¶ 2, 7).
- Defendant Yerton has been employed by CDCR since January 2007.  He is currently a Correctional Counselor II specialist, assigned to the Class Action Management Unit for CCI and Avenal State Prison.  Defendant Yerton worked as a Sergeant at CCI from July 2013 through December 2014 in relief posts and was not assigned to C-yard on a regular basis.  (Doc. No. 129-9 at 1-2 ¶¶ 2, 4).
- Defendant Escarcega was working vacation relief posts in July 2014 and was not assigned to C-yard on a regular basis.  (Doc. No. 129-5 at 2 ¶¶ 2, 4).
- Plaintiff admitted at his deposition that when he arrived at CCI in January 2014, correctional staff discovered a cellular phone and charger in his property, resulting in a rule violation report ("RVR") being issued on January 16, 2014.  He was found guilty of the RVR, which resulted in a "loss of privileges" including "no yard."  (Doc. No. 129-3 at 9:8-17).
- On January 21, 2014, Plaintiff met with Ms. Carrizales, a social worker at CCI,

11

and stated, "I don't want to get a life term for doing something" and "if I get a cellie I will hurt him, and I don't want to hurt anyone." (Doc. No. 129-4 at 4).

- Ms. Carrizales memorialized Plaintiff's statements in a "chrono" the same day because she believed "Villery may have been considering harming other inmates" and due to the nature of the statements she was "required to report these statements to custody staff." (Doc. No. 129-4 at 2 ¶ 2). Consistent with protocol, Ms. Carrizales contacted custody staff to alert them to the statements. (*Id*. ¶ 3).

- Plaintiff admitted he told Ms. Carrizales he wanted a single cell. (Doc. No. 129-3 at 9:21).

- Plaintiff admitted the basis for his request for a single cell was for his safety or because other inmates' "safety would be in danger." (Doc. No. 171-1 at 19:9-16).

- On January 21, 2014, based on Ms. Carrizales' chrono, Defendant Schmidt met with Plaintiff to determine whether Plaintiff posed a danger to other inmates. (Doc. No. 129-8 at 2 ¶ 8).

- Plaintiff admits that when he spoke to Defendant Schmidt on January 21, 2014 Schmidt told him "We don't do single cell." "CDCR is busting at the seams . . . Everything is overcrowded." (Doc. No. 129-3 at 10:9-11).

- During the investigation by correctional officers into Plaintiff's statements about potential harm to another inmate, Plaintiff was not placed in administrative segregation, but was temporarily placed on "CTQ" and "STS" *i.e.*, confined to quarters on single-cell status. (Doc. No. 129-3 at 12-13: 21-10).

- As of January 2014, Plaintiff had been in CDCR custody for 16 years and had no documented history of in-cell violence toward any other inmates despite his 2008 PTSD diagnosis. (Doc. No. 129-3 at 10:24-11:19).

- On February 1, 2014, an RVR hearing committee found Plaintiff guilty of an unrelated RVR for possession of a cellular phone and a charger. Plaintiff lost 90 days credits and privileges, including yard, telephone, evening dayroom, quarterly packages, and special privileges due to the guilty finding. (Doc. No. 129-3 at 9:8-

17).

- Defendant Schmidt issued a RVR (No. CCI-C-14-01-0035) to Plaintiff charging him with an alleged violation of California Code of Regulations title 15 § 3013 in connection with Plaintiff's statements to Ms. Carrizales.[4]  Schmidt issued the RVR only after reviewing Ms. Carrizales' 128-A chrono, meeting with Plaintiff on January 21, 2014, and reviewing Villery's file and finding, *inter alia*, that Plaintiff previously requested single-cell status on two occasions stating he was not compatible with anyone and if celled with someone he might hurt them.  Both requests occurred before the 2008 stabbing—the incident for which he claims he has PTSD.[5]  Based on these facts and the fact that Plaintiff had no documented history of any previous altercations with other cell mates, Schmidt interpreted Plaintiff's statement to Carrizales as an unlawful attempt to manipulate staff to obtain a single-cell.  (Doc. No. 129-8 at 2, ¶¶ 8-9).

- A copy of the RVR (No. CCI-C-14-01-0035) is attached to Schmidt's declaration as Exhibit B.  (Doc. No. 129-8 at 6-7).

- Plaintiff was found not guilty of RVR No. CCI-C-14-01-0035 because the hearing officer could not confirm that Plaintiff made the statements to Ms. Carrizales because Ms. Carrizales was on extended leave and was "unavailable as a witness" on the day of Plaintiff's hearing.  Plaintiff also had not been provided with copies of the two prior incident reports (CDC 7219 or CDC-114D) referenced in the RVR.  (Doc. No. 129-8 at 13-14).

- Neither Defendant Schmidt nor Jones met with Plaintiff on January 22, 2014, nor threatened him with placement in administrative segregation, write-ups, confinement to quarters, or placement on C-status in retaliation for him speaking

---

[4] California Code of Regulations section 3013 states: "Inmates shall not attempt to gain special consideration or favor from other inmates, employees, institution visitors or any other person by the use of bribery, threat, or other unlawful means."

[5] The two previous incidents referred to by Schmidt occurred on 2/11/2207 (CDC 7219) and 4/25/2007 (CDC-114D).

to mental health about his PTSD or celling issues.  (Doc. No. 129-6 at 4 ¶ 10; Doc. No. 129-8 at 3 ¶ 11).

- The first grievance Plaintiff submitted at CCI was not received by the CCI appeals office until January 31, 2014.  (Doc. No. 129-7 at 3 ¶ 8).  This date is after Schmidt's January 21, 2014 meeting with Plaintiff and after he issued Plaintiff the RVR for attempting to influence staff.

- Plaintiff admits that he had no interaction with Jones concerning the law library, Jones never told him he was not allowed to go to the library, and no one ever told him Jones was preventing him from using the library.  (Doc. No. 129-3 at 19:4-25).

- Defendant Jones did not order non-parties Karlow and Marin to deny Plaintiff library access and instead advised them that they could *not* deny Plaintiff law library access.  (Doc. No. 129-6 at 4 ¶ 11; Doc. No. 129-3 at 19:4-25) (emphasis added).

- On June 18, 2014, Plaintiff was assigned inmate Cedric Jones as a cellmate. (Doc. No. 129-3 at 27:13-18).

- Defendants Schmidt, Yerton, and Escarcega were not involved in moving Cedric Jones into Plaintiff's cell on June 18, 2014.  (Doc. No. 129-8 at 3 ¶ 5; Doc. No. 129-9 at 2 ¶ 6; Doc. No. 129-5 at 2 ¶ 8).

- On June 26, 2014, Plaintiff requested a bed move away from inmate Cedric.  On June 28, 2014, Plaintiff was moved, per his request, to cell 145 in Facility C-3. (Doc. No. 129-3 at 32:14-18).

- Defendant Schmidt did not meet with Plaintiff on June 29, 2014.  (Doc. No. 129-8 at 3 ¶ 15).

- Defendant Schmidt denies being aware of any grievances Plaintiff submitted on or before January 27, 2014, when he issued the RVR for manipulation of staff.  (Doc. No. 129-8 at 3 ¶ 12).

- Defendants Escarcega and Yerton did not have a conversation with Plaintiff on

14

July 11, 2014, regarding his bed move and were not aware of any grievances submitted by Plaintiff.  (Doc. No. 129-9 at 3 ¶ 8; Doc. No. 129-5 at 2-3 ¶¶ 9-10.)

- On July 24, 2014, Plaintiff was moved back into a cell in Facility C-2 with inmate Cedric by (former and dismissed) Defendant Nelson.  (Doc. No. 129-3 at 36:5-7).

- Escarcega, Yerton, and Schmidt were not involved in Plaintiff's July 24, 2014 bed move in which he was placed with inmate Cedric Jones.  Indeed, Yerton was not at work that day.  (Doc. No. 129-5 at 2 ¶ 8; Doc. No. 129-9 at 7 ¶3; Doc. No. 129-8 at 4 ¶ 16).

- The Appeals Office received the first grievance Plaintiff submitted at CCI on January 31, 2014, designated as "grievance against staff."  (Appeal number CCI-0-14-00242).  (Doc. No. 129-7 at 3 ¶ 8, 5).  CCI appeals office screened out the grievance on February 3, 2014 with instructions to resubmit.  (*Id.*).

**B.  Plaintiff's Claims**

In light of the above arguments and undisputed facts, the undersigned addresses each of Plaintiff's claim in seriatim.

### 1.  January 21-22, 2014 Attempts to Move Plaintiff to Administrative Segregation and/or Threat to Bring Disciplinary Proceedings, and January 27, 2014 RVR (Claims 1 and 2)

Plaintiff alleges that on January 21 and January 22, 2014, Defendants Jones and Schmidt attempted to move him to administrative segregation and threatened to bring disciplinary proceedings against him in retaliation for discussing his PTSD diagnosis with a social worker when he requested a single cell.  Similarly, Plaintiff argues the RVR authored by Schmidt and approved by Jones on January 27, 2014, charging him with improper influence, was "false" and was done for retaliatory purposes.  These claims are addressed together to the extent they stem from the same operative facts: the incident where Plaintiff told a social worker he required a single cell or he might harm a cellmate if he was housed with one.  In opposition, Plaintiff states he never threatened harm to a cellmate.  (Doc. No. 164 at 8-9).  Plaintiff argues his statements to the social worker "described his fear of potential violence, because of his mental health issues."

1    (*Id.* at 9).

2          At the heart of both claims are Plaintiff's statements made to CCI social worker, Ms.

3    Carrizales.  In the social worker's own words recorded on January 21, 2014, she quoted

4    Plaintiff's statements made to her regarding "his future in having a cell mate" as follows:

5          "I don't want to get a life term for doing something."  When asked
           for clarification, I/p Villery stated that "if I get a cellie I will hurt him
6          and I don't want to hurt anyone."

7    (Doc. No. 129-4 at 4).  Ms. Carrizales testified Plaintiff "voluntarily" made the statements when

8    speaking with him about his "CCCMS status."  (*Id.*).

9          Defendants argue that Plaintiff's statements to Ms. Carrizales were not protected speech

10   under the First Amendment and thus any response to them cannot form the basis of a retaliation

11   claim.  (Doc. No. 129-1 at 14).  The Court agrees.  Statements consisting of threats of harm to

12   other inmates are often prohibited by prison regulations and subject to punishment.  *See generally*

13   *Lane v. Swain*, 910 F.3d 1293, 1294 (9th Cir. 2018) (denying First Amendment challenge to a

14   Bureau of Prisons regulation prohibiting prisoners from sending letters threatening physical harm

15   and affirming resulting loss of good time credits);  *Lane v. Salazar*, 911 F.3d 942, 947-48 (9th

16   Cir. 2018) (finding same BOP regulation serves a legitimate governmental interest in

17   rehabilitation and did not violate petitioner's First Amendment rights); *Richey v. Dahne*, 733 F.

18   App'x 881, 884 (9th Cir. 2018) (finding that inmates do not have a First Amendment right to use

19   disrespectful language in the prison environment and prison officials are justified for curtailing

20   such behavior).

21         Plaintiff asks the Court to find a difference without a distinction in claiming that he was

22   not making threats but simply "describing how the symptoms of his diagnosed PTSD manifested

23   in his life."  (Doc. No. 164 at 25).  Viewed in context, Plaintiff's statements are not protected

24   speech giving rise to a retaliation claim.  Correctional officials reasonably interpreted Plaintiff's

25   sentiments, which were expressed to Ms. Carrizales and confirmed to other staff, as a threat to

26   harm others if Plaintiff was housed with a cellmate.  Having construed these statements as a

27   veiled threat, correctional officials then reasonably viewed these statements as an attempt to

28   "unlawfully influence" staff and housing.  As the Ninth Circuit determined in a separate action

16

1    filed by Plaintiff, correctional officials are entitled to deference in choosing where to house

2    inmates.  (*Supra* at 9).

3        Because Plaintiff's statements to Ms. Carrizales do not qualify as "protected conduct"

4    under the first prong of a retaliation claim, the Court need not analyze the remaining elements of

5    the claim, but further notes that the alleged adverse action taken against Plaintiff, the RVR for

6    unlawful influence, served the legitimate correctional objective of ensuring institutional safety.

7    While issuance of a disciplinary report has a punitive aspect, it was issued here in response to a

8    safety threat and therefore furthered a legitimate correctional objective.  *Pratt*, 65 F.3d at 807.

9        Nor does the other adverse action Plaintiff cites, Defendants "threatening" to place him in

10   administrative segregation, set forth a retaliation claim.  The record reflects that after prison staff

11   learned of Plaintiff's statements to Ms. Carrizales they placed Plaintiff in a holding cell while

12   they investigated the seriousness of the potential threat.  (Doc. No. 129-3 at 12-13).  Plaintiff was

13   returned to his cell shortly thereafter while correctional officials continued to investigate

14   Plaintiff's threats and determine whether he should be placed in administrative segregation.  (*Id.*).

15       Correctional officials have a duty to protect those in custody from any threat of harm by

16   their fellow inmates, including Plaintiff.  *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

17   Moreover, it is well established that prisoners have no federal constitutional right to a particular

18   classification or program status or to a choice in their housing.  *Hernandez v. Johnston*, 833 F.2d

19   1316, 1318 (9th Cir. 1987) (citing *Moody v. Daggett*, 429 U.S. 78, 88 n.9, 97 S.Ct. 274, 50

20   L.Ed.2d 236 (1976)). Nor do prisoners have a liberty interest in remaining in the general

21   population.  *McFarland v. Cassady*, 779 F.2d 1426, 1428 (9th Cir.1985).  "[I]t is well settled that

22   prison officials must have broad discretion, free from judicial intervention, in classifying

23   prisoners in terms of their custodial status."  *McCord v. Maggio*, 910 F.2d 1248, 1250 (5th Cir.

24   1990) (citations and internal quotation marks omitted).  *Accord, Garcia v. Biter*, 2016 WL

25   2625840, at *2 n.2 (E.D. Cal. May 9, 2016) ("Plaintiff's housing status and other custody or

26   classification factors are left to the sound discretion of prison officials.").

27       The Court finds that correctional officials' decision to document and investigate Plaintiff's

28   threats, with the potential of placing Plaintiff in restricted housing, served the legitimate

1    penological objective of ensuring institutional safety.  Thus, their actions, while arguably

2    punitive, cannot form the basis of a retaliation claim.  Further, Plaintiff does not point to any

3    harm that resulted from the mere possibility that he would be placed in Ad-Seg.  To the extent

4    Plaintiff claims Defendants Schmidt and Jones made threats or spoke harshly to him during the

5    alleged meetings on January 21 and 22, 2014, verbal threats, without any evidence of harm, are

6    insufficient to support a retaliation claim.  *See Garcia v. Beard*, 2016 WL 8731199 * 6 (E.D. Cal.

7    May 6, 2016) (finding allegations of threats and harassment cannot support a claim for retaliation

8    without evidence of harm).  Thus, the undersigned recommends that the district court find

9    Defendants Schmidt and Jones are entitled to summary judgment as a matter of law on Claims 1

10    and 2.

11          Defendants Jones and Schmidt raise, in the alternative, the affirmative defense of qualified

12    immunity concerning their use of Plaintiff's statements to Ms. Carrizales to place him in

13    temporary restricted housing.  (Doc. No. 129-1 at 17, 19).  Defendants argue they had no notice

14    based on existing law that Plaintiff's threatening statements to a social worker, or oral complaints,

15    were protected under the First Amendment and would violate clearly established law.

16          Qualified immunity shields government officials from money damages unless their

17    conduct violated "clearly established statutory or constitutional rights." *Kisela v. Hughes*, 138 S.

18    Ct. 1148, 1152 (2018); *accord Felarca v. Birgeneau*, 891 F.3d 809, 815 (9th Cir. 2018).  To

19    overcome the heavy burden of qualified immunity, Plaintiff must show that "(1) the official

20    violated a statutory or constitutional right, and (2) that the right was clearly established at the time

21    of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  Qualified immunity

22    only becomes relevant if a court determines that a constitutional violation has occurred.

23          Because the undersigned has found the record presents no genuine dispute of material fact

24    on Plaintiff's retaliation claims against Defendants Schmidt and Jones, the undersigned need not

25    evaluate whether Defendants are entitled to qualified immunity.

26          **2.  Denial of Access to Law Library (Claim 3)**

27          Next, Plaintiff claims Defendant Jones denied him access to the law library and alleges

28    Jones did this in retaliation for Plaintiff filing grievances on January 22, 23, and 30, 2014.  (Doc.

18

No. 16 at 6 ¶¶ 27-28).  Plaintiff asserts that he suffered restricted access to the law library from February 1 to May 2, 2014.  (*Id.* ¶ 27).  Plaintiff acknowledges this was due in significant part to a 90-day yard restriction stemming from his February 1, 2014 RVR for possession of an illegal cellphone and charger.  (*Id.* ¶ 27; *supra* at 3).  Because of his restricted yard access, during that time period, Plaintiff could not access the law library without being called by the library staff and being released by his housing unit.  (Doc. No. 16 at 19 ¶ 28).  Plaintiff was called twice by library staff during this time and admits that he snuck into the law library on three other occasions, but on several other occasions his requests for access were ignored.  (Doc. No. 164 at 12; Doc. No. 16 at 6-7 ¶¶ 29, 32).  Plaintiff claims that he confronted Library Technician Assistant Marin about the failure to respond to his requests for access, and Marin told Plaintiff that he needed to provide upcoming court deadlines to be placed on Preferred Legal User ("PLU") status and access the library.  (Doc. No. 165 at 19-20 ¶ 30).  When Plaintiff protested, Marin told Plaintiff that because he was on "C-status" she couldn't call him in without a court deadline, and that this was "the Captain's policy."  (*Id.*).  Defendant Jones denies that he did anything to limit Plaintiff's access to the law library, and instead asserts that he advised them that they could *not* deny Plaintiff law library access.  (Doc. No. 129-6 at 4; Doc. No. 129-3 at 19).

Even assuming Defendant Jones instituted a policy that had the effect of limiting Plaintiff's access to the law library, there are no facts alleging that the policy applied only to Plaintiff, much less that it was introduced in response to Plaintiff's First Amendment conduct. Assuming the truth of Plaintiff's conversation with LTA Marin, she described only a general policy applying to all inmates classified with "C-status" rather than an action targeted at Plaintiff.[6]  Plaintiff speculates, without citing any evidence, that Defendant Jones "ordered Marin and [Marin's supervisor] Karlow to restrict Villery from accessing the library, allegedly based on being on yard restriction" but there are no facts to support the claim that this action was targeted at Villery.  Mere speculation that Jones targeted Plaintiff and acted out of retaliation is not sufficient to state a claim.  *Wood*, 753 F.3d at 905.

---

[6] Although Plaintiff was in Loss of Privileges status, rather than C-status, Marin later acknowledged that she conflated the two in telling Plaintiff he needed to provide a court deadline to use the library.  (*See* Doc. No. 129-6 at 19-20).

1    There is thus no dispute of material fact regarding the reasons for Plaintiff's restricted

2    library access or whether Defendant Jones retaliated against Plaintiff.  Thus, the undersigned

3    recommends that the district court find Defendant Jones is entitled to summary judgment on

4    Claim 3.

5    ### 3.   June 29, 2014 Threats by Defendant Schmidt in Response to
     ### Plaintiff's Grievance (Claim 4)

6

7    Plaintiff next claims that on June 29, 2014, Defendant Schmidt threatened Plaintiff with

8    disciplinary charges if he filed another grievance "anything like" Plaintiff's June 26, 2014

9    grievance regarding his housing.  (Doc. No. 16 at 6-8 ¶¶ 34-39).  In the June 26, 2014 grievance

10   (formally speaking, an Inmate Request for Interview, Item, or Service (CDCR Form 22)),

11   Plaintiff requested a new cellmate because of "numerous instances of near violence due to

12   [Plaintiff's] own mental issues and mental instability of [his] cellmate."  (Doc. No. 129-3 at 43);

13   (*see also* Doc. No. 85-4 at 27; Doc. No. 85-4 at 21 ¶ 18).  In the Form 22, Plaintiff opined he

14   would be "more compatible" with inmate Hardin.  (Doc. No. 129-3 at 43).  Plaintiff stated he had

15   apprised "staff" "on multiple occasion" of his "problems" with inmate Cedric but they refused to

16   accommodate him out of retaliation.  (Doc. No. 129-3 at 43).

17   Two days after he filed the grievance, Plaintiff was moved to another housing unit.  (Doc.

18   No. 16 at 8 ¶ 37).  The following day, Plaintiff was "called to the facility unit office" where

19   Schmidt "confronted" him about the June 26, 2014 grievance.  (*Id*. ¶ 38).  Plaintiff asserts in his

20   FAC that Schmidt stated he would file another disciplinary charge of manipulation of staff if

21   Plaintiff filed another similar grievance in the future and that Schmidt told him, "you don't

22   choose who you live with here, we do."  (*Id*. ¶ 39).  Plaintiff includes additional detail and a new

23   allegation regarding this conversation in his Opposition and an attached declaration, stating that

24   Schmidt issued "two different threats" during the conversation.  (See Doc. No. 164 at 14; Doc.

25   No. 165 at 25 ¶ 41).  Plaintiff claims that he protested to Schmidt that his bed move had resulted

26   in him being unable to keep his job as a janitor in housing unit two.  (*Id*.).  Schmidt allegedly told

27   him, "if you're so concerned about your job, I can move you back in the same cell with that guy,

28   is that what you want?" and continued "[i]f you keep complaining about your job I'll have you

1   moved back in with the same guy in two block." (*Id.* at 25-26 ¶ 41). This claim is absent from

2   Plaintiff's FAC, and Plaintiff admits that "[b]ecause of the limited space available on the appeal

3   form," he did not mention it in the grievance he filed immediately after the conversation with

4   Schmidt. (*See* Doc. No. 16 at 8; Doc. No. 165 at 26 ¶ 42).

5          As noted above, Plaintiff's filing of an inmate grievance is an activity protected under the

6   First Amendment. Because the Form 22 is an informal precursor to filing a formal 602 grievance,

7   it can reasonably be deemed protected First Amendment activity like the filing of a formal

8   grievance. *See McCoy v. Cnty. of Riverside*, 2015 WL 134285, at *4 (C.D. Cal. Jan. 9, 2015)

9   (noting that "CDCR's regulations accord substantial discretion to prison officials to decide

10  whether to require a prisoner to complete the Form 22 process before accepting a Form 602

11  appeal").

12         Assuming the June 29, 2014 meeting with Defendant Schmidt occurred as Plaintiff

13  describes, the FAC nevertheless fails to state a claim. To state a retaliation claim, Plaintiff must

14  show, inter alia, that Schmidt's statements constituted an adverse action and lacked any legitimate

15  penological purpose. As to Schmidt's statement that he would issue Plaintiff another RVR for

16  manipulation of staff, which Plaintiff characterizes as a "threat," this warning served the

17  legitimate purpose of ensuring institutional order. *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir.

18  1995) (prisoner suing prison officials under section 1983 for retaliation must allege that he was

19  retaliated against for exercising his constitutional rights and that the retaliatory action did not

20  advance legitimate penological goals, such as preserving institutional order and discipline);

21  *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994) (per curiam) (same). Defendant Schmidt did

22  not claim he would arbitrarily issue Plaintiff an RVR for manipulation of staff but stated that if

23  Plaintiff persisted in conduct Schmidt deemed to be manipulation of staff ("I know you're trying

24  to manipulate staff again"), Schmidt would issue an RVR accordingly. (Doc. No. 165 at 25 ¶ 40).

25  Thus, because Schmidt's alleged statements served the legitimate penological purpose of

26  preserving institutional order, they cannot establish a claim of retaliation.

27         As to Plaintiff's claim that Schmidt threatened to rehouse him with Plaintiff, this assertion

28  is notably absent in his FAC. Plaintiff offers an explanation as to why it was not mentioned in his

602 regarding the incident, but does not explain why it was omitted from the FAC.  An argument based on new factual bases, akin to one based on new legal theories, is improperly raised at the summary judgment stage.  *See Pena v. Taylor Farms Pac., Inc*., 2014 WL 1330754, at *4 (E.D. Cal. Mar. 28, 2014).   The Ninth Circuit has held that new fact allegations asserted in response to a summary judgment motion that go "beyond" those alleged in the complaint may be disregarded, on the ground that the defendant had "no notice of the specific factual allegations presented for the first time in . . . opposition to summary judgment."  *Pickern v. Pier 1 Imports (U.S.), Inc*., 457 F.3d 963, 968–69 (9th Cir. 2006).  Because Plaintiff never alleged in his FAC that Schmidt threatened to rehouse him with Inmate Cedric, a new and significant factual assertion, the Court will disregard this separate claim of retaliation.

Finding that Plaintiff's claims as to his conversation with Defendant Schmidt do not establish the basis of a retaliation claim, the undersigned recommends Defendant Schmidt be granted summary judgment on Claim 4.

### 4. Schmidt, Yerton, and Escarcega Re-Housing Plaintiff With Inmate Cedric Jones (Claim 4)

Plaintiff's next claim asserts that Defendants Schmidt, Yerton, and Escarcega rehoused Plaintiff with inmate Cedric in retaliation for his filing of grievances.  (Doc. No. 164 at 15). Defendants submit evidence that Schmidt, Yerton and Escarcega were not involved in Plaintiff being rehoused with inmate Cedric in July of 2014.  In fact, the evidence reflects that Defendant Yerton was not working on July 24, 2014, the date Plaintiff's was reassigned to a cell with inmate Cedric Jones.  The Court takes judicial notice of its findings of fact issued in relation to Defendant Nelson's motion for summary judgment and Plaintiff being rehoused with inmate Cedric Jones on July 24, 2014.  In addition to the undisputed facts discussed above, the Court found the following facts unrefuted.

- On July 24, 2014, Captain Jay Jones instructed Defendant Nelson to find housing in Unit 2 for Plaintiff, so Plaintiff could resume his second watch porter position. (Doc. No. 85-4 at 22 ¶ 20).

- Unit 2 was close to full at the time, "making it difficult to unilaterally move an

inmate." Defendant Nelson learned all other inmates in Unit 2 were getting along with their cellmates and examined all available housing option in Unit 2 "with the considerations including the functioning programming going on throughout the unit." (*Id*.). A copy of the available bed inventory dated July 30, 2014 for Unit 2 is attached to Nelson's declarations. (Doc. No. 85-4 at 29-33). The inventory reveals 6 vacant beds, 5 of which are upper bunks. (*Id*.). The sole lower bunk in 114 did not become available on July 29, 2014, which was five days after Plaintiff had been moved. (*Id*)

- Nelson identified two potential cellmates available in Unit 2: inmate Cedric or an inmate who was a "Southern California Skinhead" who had a lower-bunk medical limitation. Plaintiff also had a lower-bunk medical limitation and thus could only have a cell mate who had no issues with being assigned a top bunk. (Doc. No. 85-4 at 22 ¶ 21).

- There was no evidence in the record to suggest that there was a conflict or reason why Plaintiff and inmate Cedric could not be housed together. Inmate Cedric and Plaintiff were not documented enemies. (Doc. No. 85-4 at 22-23 ¶ 21).

- Defendant Nelson reviewed the confidential and miscellaneous files for Plaintiff and inmate Cedric and both inmates' history of aggression. Nelson found nothing had changed since they were previously housed together. In reviewing the files, Defendant Nelson saw Plaintiff's June 28, 2014 housing change was simply noted as a "cell swap" and there was no notation that Plaintiff could not be rehoused with inmate Cedric. Nelson personally witnessed on his unannounced visits in June 2014 "both inmates sitting together on the lower bunk, laughing and playing dominoes." (Doc. No. 85-4 at 22-23 ¶ 21).

- Sergeant Ignacia Vera, who is not named as a Defendant, reviewed and approved a Bed Request Batch for inmate Cedric's move into Cell 148. Meanwhile, another correctional officer issued a Bed Batch Request concerning Unit 3 to move Plaintiff to Unit 2, Cell 148. And Sergeant Davis, who is not named as a

23

Defendant, reviewed and approved that Bed Batch Request.  Central Control then reviewed and processed the Bed Batch Request, and Plaintiff and inmate Cedric were moved that day on July 24, 2014.  (Doc. No. 85-4 at 23 ¶ 24).

- On July 24, 2014, Nelson escorted Plaintiff to a cell located in Building 2, where inmate Cedric already was located.  Plaintiff did not refuse to enter the cell with inmate Cedric.  Instead, he went into the cell without saying a word and was not forced in any way.  (Doc. No. 85-4 at 23 ¶ 22).  Had Plaintiff refused to enter the cell, Nelson would not have required him to enter the cell and instead would have placed him in the dayroom and alerted a supervisor.  (*Id.*).

- Defendant Nelson had no decision-making authority as to Plaintiff's safety Classification or his housing restriction.  (Doc. No. 85-4 at 21-22 ¶ 18; 23 ¶ 21).  At his deposition, Plaintiff agreed that his cell move had to be approved by Defendant's superior officer and acknowledged Defendant Nelson did not make the decision on his own "but would have had to come from the top."  (Doc. No. 85-4 at 14:1-9).  Defendant Nelson adhered to CDCR regulations and CDCR's operations manual when evaluating where to rehouse Plaintiff.  (Doc. No. 85-4 at 24-24, ¶ 30).

- On July 24, 2014, Plaintiff submitted a Form 22, complaining about being placed back into a cell with inmate Cedric.  This Form 22 was accepted and processed according to CDCR rules and regulations.  (Doc. No. 85-4 at 35).  On August 11, 2014, Plaintiff filed a 602 against Defendant Nelson.  (Doc. No. 85-4 at 15:3-7).  Plaintiff had not previously filed a grievance against Defendant Nelson prior to this date.  (*Id.*).

- On July 30, 2014, correctional officials moved Plaintiff from the cell with inmate Cedric.  Nonetheless, the two continued to live in the same housing unit without incident.  On November 23, 2014, correctional officials moved Plaintiff to a different housing unit.  (Doc. No. 85-4 at 24 ¶ 28).

As noted in the October 14, 2022 Findings and Recommendations, Plaintiff was rehoused

1   with inmate Cedric in response to Plaintiff's own request to move back to the housing unit and

2   the lack of suitable alternative housing.  Legitimate penological interests will defeat a retaliation

3   claim.  *See Barnett*, 31 F.3d at 815; *Bruce*, 351 F.3d at 1289-90.  Here, the legitimate penological

4   interest was the need to place Plaintiff and other inmates in cells that complied with any safety-

5   related restrictions and thereby ensure inmate safety.  Further, the Court is required to "'afford

6   appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate

7   penological reasons for conduct alleged to be retaliatory."  *Pratt*, 65 F.3d at 807 (quoting *Sandin*,

8   515 U.S. at 482).

9       The evidence of record shows that rehousing Plaintiff with inmate Cedric was: (1) initially

10   precipitated by Plaintiff's desire to regain his second watch porter job; (2) initiated by Captain Jay

11   Jones; (3) suggested by (former and dismissed defendant) Nelson after evaluating and considering

12   all available housing options and criteria; (4) reviewed and approved by (nondefendant) Sergeant

13   Ignacia Vera; and (5) reviewed and approved by (nondefendant) Sergeant Davis.  There is no

14   evidence that Schmidt, Yerton (who was not at work the day of the move), and Escarcega had any

15   involvement in the rehousing, yet alone that they did so based on a retaliatory motive.

16       Moreover, double celling Plaintiff with inmate Cedric does not constitute an "adverse

17   action" based on the undisputed facts presented.  Pursuant to Cal. Code Regs. Tit. 15, § 3269,

18   inmates are not entitled to single cell housing and in fact the norm is double celling.  Nor are

19   inmates entitled to a cell of their choice or a cellmate of their choice.  *See Mooring v. San*

20   *Francisco Sheriff's Dep't*, 289 F. Supp. 2d 1110, 1119 (N.D. Cal. 2003).  Further, there is no

21   evidence that any correctional official involved in Plaintiff's rehousing viewed placing Plaintiff in

22   the same cell as inmate Cedric as a punishment.

23       The record here thus contains no genuine dispute as to whether Escarcega, Yerton, and

24   Schmidt were involved in the actions giving rise to this claim.  Mere speculation that Defendants

25   acted out of retaliation is not sufficient.  *Wood*, 753 F.3d at 905.  Direct or circumstantial

26   evidence of retaliation is required, and Plaintiff has not provided either.  *McCollum v. Cal. Dep't*

27   *of Corr. & Rehab*., 674 F.3d 870, 882 (9th Cir. 2011).  Accordingly, for the reasons set forth

28   above, the undersigned recommends the district court find Defendants Schmidt, Yerton, and

1    Escarcega are entitled to summary judgment as a matter of law as to Claim 4.

2              **5.  Jones' Destruction of, or Refusal to Forward Plaintiff's**
          **March 20, 2014 Grievance (Claim 5)**
3

4        In his fifth and final retaliation claim, Plaintiff claims Defendant Jones destroyed or

5    refused to forward Plaintiff's March 20, 2014 inmate grievance appeal because Jones thought the

6    appeal was frivolous.  (*See* Doc. No. 19 at 16-17; Doc. No. 165 at 34 ¶ 58).  The grievance appeal

7    at issue concerns grievance No. CCI-0-01-0024, in which Plaintiff disputed his finding of guilt

8    for possession of a cell phone and charger.

9        The parties agree that Plaintiff filed the appeal, it was received by the appeals office, and

10   was "screened out" on March 11, 2014, requiring Plaintiff to remedy certain deficiencies and

11   resubmit it.  (Doc. No. 129-7 at 3; Doc. No. 165 at 33 ¶ 55).  In his opposition, Plaintiff asserts

12   that he resubmitted the appeal on March 20, 2014, that it was collected by Sergeant Rhodes on the

13   morning of March 21, 2014, and it would have been delivered to Defendant Jones' office, but the

14   "appeal was never processed"; Plaintiff attaches copies of documents purporting to show the

15   destroyed or withheld appeal, a filing receipt for the resubmitted appeal signed by Defendant

16   Nelson, and a copy of the Daily Activity Report for March 21, 2014, showing that Rhodes was

17   responsible for picking up appeals that day.  (Doc. No. 165 at 33, ¶¶ 55-56, 249-59).

18       Plaintiff also asserts that on July 31, 2014, four months after he resubmitted the appeal,

19   Jones admitted to having held it in his office.  (Doc. No. 165 at 34 ¶ 58.)  Jones allegedly asked

20   Plaintiff why he was "wasting [his] time" appealing the RVR.  (*Id*.).  Jones indicated it was

21   obvious to him that Plaintiff was guilty and that Jones "remember[ed] when [Plaintiff] was caught

22   with the phone, I was on the yard that day."  (*Id*.).  Jones then stated to Villery that the appeal was

23   "sitting in [his] office, where it's going to stay, because I think you're a liar."  (*Id*.).

24       In his deposition in this case, Plaintiff admits to having been in possession of the cell

25   phone and charger in violation of prison rules.  "I got [the phone] from an officer at Lancaster and

26   I got caught coming through back from the x-ray machines on my property on January 15th, 2014.

27   I was issued a disciplinary write-up for it."  (Doc. No. 129-3 at 9:8-13).  Plaintiff commented that

28   it was "stupid" of him.  (*Id*.).

26

1    As an initial matter, even assuming that Plaintiff's account of the July 31, 2014 interview

2 with Jones is accurate, which Jones denies, the Court finds Plaintiff's retaliation claim fails

3 because the appeal was frivolous.  An inmate has an undisputed First Amendment right to file

4 grievances against prison officials on his own behalf.  *See Noble v. Schmitt*, 87 F.3d 157, 162 (6th

5 Cir. 1996).  This right is protected, however, only if the grievances are not frivolous.  *See Lewis v.*

6 *Casey*, 518 U.S. 343, 353 (1996) ("Depriving someone of a frivolous claim . . . deprives him of

7 nothing at all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions.");

8 "Prisoners' grievances, *unless frivolous* . . . , concerning the conditions in which they are being

9 confined are deemed petitions for redress of grievances and thus are protected by the First

10 Amendment."  *Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1005 (7th Cir. 2005) (emphasis

11 added).  Here, there is no dispute of material fact that Plaintiff's appeal of his guilty finding was

12 frivolous.  Plaintiff admits that he was guilty of the underlying RVR, and so any appeal of the

13 decision was made in bad faith and therefore frivolous.

14    Moreover, assuming that Defendant Jones impeded Plaintiff's appeal, there is no evidence

15 to indicate Jones' conduct had any chilling effect on Plaintiff's filing of further appeals; in fact,

16 the record shows that he filed numerous other grievances and appeals while at CCI.  (*See* Doc.

17 No. 129-7 at 5-7).  While the Ninth Circuit has held that a plaintiff need not demonstrate "a total

18 chilling" of his First Amendment activity to perfect a retaliation claim, it nevertheless requires

19 some allegation that plaintiff's First Amendment rights were chilled, if not silenced.  *Rhodes v.*

20 *Robinson*, 408 F.2d 559, 568-69 (9th Cir. 2005).  Here, Plaintiff does not assert that his First

21 Amendment rights were chilled in any way.  Indeed, Plaintiff's record of prolific First

22 Amendment activity at CCI subsequent to the purported July 31, 2014 conversation would

23 strongly belie such a claim.  Accordingly, Plaintiff cannot establish another of the essential

24 elements of a retaliation claim: a chilling of his First Amendment rights.

25    Finally, even assuming Plaintiff's appeal was lost or not timely processed, there is no

26 constitutional right to an adequate prison administrative appeal or grievance system.  *See Wolff v.*

27 *McDonnell*, 418 U.S. 539, 565 (1974) (accepting that Nebraska did not provide administrative

28 review of disciplinary decisions); *Garfield v. Davis*, 566 F.Supp. 1069, 1074 (E.D. Pa. June 1,

1983) (dismissing allegations with respect to administrative review of disciplinary decision because no right to such review).  Nor has California adopted regulations from which a constitutionally protected interest in such a system could arise.  California Code of Regulations, title 15 sections 1073 and 3084 grant prisoners a purely procedural right: the right to have a prison appeal.  The regulations simply require the establishment of a procedural structure for reviewing prisoner complaints and set forth no substantive standards; instead, they provide for flexible appeal time limits, *see* Cal. Code Regs. tit. 15, § 3084.6, and, at most, that "no reprisal shall be taken against an inmate or parolee for filing an appeal." *Id*. § 3084.1(d).  Such a provision, which merely provides procedural requirements, even if mandatory, cannot form the basis of a constitutionally cognizable liberty interest. *See Smith v. Noonan*, 992 F.2d 987, 989 (9th Cir. 1993) (statute or regulation must place substantive limitations on official discretion to form basis of constitutionally protected liberty interest); *see also Cage v. Cambra*, 1996 WL 506863, at *1 (N.D. Cal. Aug. 19, 1996) (denying § 1983 claim based on prison officials' failure to properly process and address administrative appeals because no constitutional right to grievance process).  Accordingly, Plaintiff can at most establish a violation of prison regulations, not a constitutional right.

Based on the foregoing, there is no genuine dispute that Plaintiff fails to establish the essential elements of a retaliation claim with regards to his March 20, 2014 grievance appeal and the undersigned recommends the district court grant summary judgment for Defendant Jones on this claim.

Accordingly, it is **RECOMMENDED**:

The district court GRANT Defendants Jones, Yerton, Schmidt, and Escarcega Motion for Summary Judgment (Doc. No. 129) and judgment be entered in their favor and this case closed.

<u>NOTICE TO PARTIES</u>

These findings and recommendations will be submitted to the United States district judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within **fourteen (14) days** after being served with these findings and recommendations, a party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's

Findings and Recommendations."  Parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

Dated:    September 12, 2023

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE

29